# STATE OF FLORIDA v CABALLERO

## Case No. 84-14464 CF

Seventeenth Judicial Circuit, Broward County

January 31, 1986

### APPEARANCES OF COUNSEL

**Peter Lent,** Assistant State Attorney, for plaintiff.

**Christopher Grillo** for defendant.

### OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

### *ORDER ON DEFENDANT'S MOTION TO DISMISS PREDICATED UPON CONSTITUTIONALLY UNACCEPTABLE POST ARREST POLICE MISCONDUCT*

"LIBERTY EXISTS IN PROPORTION TO WHOLESOME RE-STRAINT"

## "THE LAW: IT HAS HONORED US; MAY WE HONOR IT."

Daniel Webster, May 10, 1847

On December 17, 1984, Defendant, Ruben Caballero, was arrested for, and charged with, trafficking in cocaine, escape, battery upon a law enforcement officer, and resisting arrest with violence. The Defendant was arrested by Broward County Sheriff's deputies Steve Gaffney and Dale Owens. The charges arose when the detectives confronted the Defendant at the Greyhound bus terminal in Fort Lauderdale and requested permission to search his luggage. It is no secret that the State will contend that the accused agreed to allow such search and the Defendant, equally vigorously, will contend that legally acceptable consent was not given.

The State also alleges that the accused, after cocaine was found in his luggage by Detectives Gaffney and Owens, ran away from the scene and attempted to conceal himself, only to be quickly discovered, handcuffed and transported to the office of the detectives at the Fort Lauderdale/Hollywood International Airport. Upon arrival at the airport, which was then under extensive renovation, Mr. Caballero again attempted to escape. This last abortive attempt to avoid being taken into custody upon the cocaine trafficking accusation led to the filing of the charges alleging escape, battery upon a law enforcement officer and resisting arrest with violence.

The criminal case against Mr. Caballero began to trace a normal path through the criminal justice system of this Circuit. On January 24, 1985, a written plea of not guilty and standard discovery requests were filed by Mr. Christopher Grillo. Mr. Alan Bell, now in private practice, filed an appropriate response to the discovery requests made by the accused and invoked the reciprocal discovery provisions of Florida's Rules of Criminal Procedure.

For aught that appears in the court records of this case, there was nothing unusual in the making. Sometime in March or April, 1985, the first of the storm warning flags seems to have been raised.

During the course of pretrial preparation, defense counsel engaged the services of Mr. Fred Krasco, an individual licensed in the State of California—but not Florida—to function as a private investigator. During the course of his investigation, Mr. Krasco undertook surreptitious surveillance of Detectives Gaffney, Owens and Bill Barnes in an effort to develop evidence that their technique of approaching suspected drug couriers and obtaining consent to search personal luggage was not conducted in accordance with prevailing legal concepts. The detectives became aware of the activities of Mr. Krasco and sought relief from

44

such surveillance, contending that their ability to function was hampered by their fear that their identities would be exposed and they would, therefore, become targets for hostile actions initiated by aggrieved parties. Then Assistant State Attorney Alan Bell contacted Mr. Grillo and requested his assurance that Mr. Krasco would cease and desist all such surreptitious surveillance. Mr. Grillo agreed to, and did, request Mr. Krasco to use other means to accumulate the information sought in reference to Detectives Gaffney, Owens and Barnes.

On August 14, 1985, the fat hit the frying pan and the present controversy broke to the surface.

In the late afternoon of August 14, 1985, Detectives Gaffney, Owens and Barnes were engaged in their normal activities of attempting to interdict the illegal flow of narcotics upon the greyhound buses utilizing the terminal in Fort Lauderdale. Although the sun had already set, the afternoon had not yet changed to twilight due to the advent of daylight savings time, thus affording to all a sufficient amount of natural light to permit viewing.

While speaking to a bus passenger who exhibited the characteristics commonly known as the "drug courier profile", Detective Gaffney called the attention of Owens and Barnes to his perception that a party in a slowly moving automobile was pointing something at them through the window of the vehicle. Apparently becoming aware that they had been observed, Mr. Krasco (the party who was aiming a camera through the automobile window in the direction of the detectives) directed Mr. Caballero, the driver, to leave the scene. Whether Mr. Caballero left the scene in a rapidly accelerating manner or at a normal speed is the subject of much dispute but, in the Court's opinion, is not germane to the issues that must now be resolved.

The "pursuit", if it can be called that, of Mr. Caballero and Mr. Krasco, was neither lengthy nor conducted at high speeds. Mr. Krasco directed Mr. Caballero to stop the rented vehicle in which they were travelling at the first street south of the Federal Highway tunnel under the New River canal (a street later identified as Southeast Sixth Court, located just a few blocks from the Broward County Courthouse and jail). Detectives Gaffney and Barnes, travelling in one vehicle, and Detective Owens, travelling in another vehicle, (each of which were unmarked cars used in covert activities) quickly arrived and parked in close proximity to the vehicle occupied by Messrs. Caballero and Krasco. As Detectives Gaffney and Barnes approached the pursued vehicle on foot, Mr. Caballero and Mr. Krasco approached the pursuing vehicle in the same manner. At the direction of Detective Gaffney,

**45**

Messrs. Krasco and Caballero assumed the time honored "position" by spreading their legs, leaning forward and placing their hands upon their vehicle.

Detective Gaffney recognized the arrestees immediately upon their alighting from their vehicle. Detective Barnes, not having been previously in contact with either Mr. Krasco or Mr. Caballero, didn't discern their identities until a few moments after the drama on Southeast Sixth Court began to unfold, when Mr. Owens arrived upon the scene. Detective Owens had no difficulty in recognizing the two persons in custody as soon as he saw them at the scene of their arrest. Detectives Gaffney and Owens were extremely angry with Mr. Krasco and Mr. Caballero, although Detective Gaffney seems to have been the one who was most enraged.

The Court has no doubt that what happened next is the direct result of the detectives having lost their usual professional detachment. Instead of merely performing their duties in a manner that would be above suspicion, the three detectives—all of whom have served with distinction as front line fighters in the war against illegal drug trafficking—permitted themselves the prohibited luxury of functioning as human beings, with all the emotions attributable thereto. When professionalism is placed in a position inferior to personal feelings, grave errors of judgment of constitutional dimension are committed.

The scene of this confrontation was in an otherwise quiet residential neighborhood, resulting in a number of curious people milling about the scene. From one of the onlookers, Detective Gaffney obtained permission to utilize a private telephone for the purpose of contacting Mr. Grillo and Mr. Bell. The efforts in locating Mr. Grillo, unlike the efforts in locating Mr. Bell, were successful. Detective Gaffney informed Mr. Grillo of the circumstances under which Mr. Krasco and Mr. Caballero had been detained and that they were to be charged with what was described as "obstruction of justice". Mr. Grillo declared his ignorance of the activities of his client and his investigator and confirmed that he was most interested in what would next happen in the matter.

Unable to reach Mr. Bell, Detective Gaffney was successful in establishing contact with then Assistant State Attorney Martin Jaffe, one of the supervisors of the organized crime unit of the State Attorney's office. Mr. Jaffe was informed of the circumstances leading up to the detention of Messrs. Krasco and Caballero and he, in turn, advised Detective Gaffney of the latter's prerogative to perfect an arrest of the detainees for interfering with an officer in the performance of a

46

lawful duty. Mr. Jaffe simultaneously advised Detective Gaffney that the probable cause to arrest didn't necessarily portend success in any criminal proceeding that might thereafter ensue.

Armed with official assurance of his right to do so, and still very angry over all that had transpired to date in reference to the Caballerato case, Detective Gaffney returned to the street where his colleagues had the detainees in their care. The subjects were then informed, formally, that they were under arrest for "obstructing justice" and that the vehicle in which they had been riding would be impounded. Mr. Krasco voiced his objections to the arrests of himself and Mr. Caballero. More cogently to that which is now before the Court, Mr. Krasco advised one and all that the vehicle about to be searched contained confidential documents relating to the Caballero case as well as other matters in which Mr. Krasco was retained to function as a private investigator. Not only did his protestations fall upon deaf ears, the words uttered by him seemed to add fuel to the fire much as a motorist depresses an automobile accelerator and causes the engine revolutions to increase accordingly.

Ostensibly for the purpose of inventorying the contents of the impounded vehicle, Detectives Gaffney and Owens removed numerous papers, two briefcases, two cameras (each containing exposed and unexposed film), an exposed video tape cassette, a file folder and its contents, and a large number of developed photographs. Much of the material was clearly marked so as to indicate that it was confidential, or the property of Mr. Grillo, or material relating to the criminal charges then pending against Mr. Caballero, or was not to be examined except upon the express consent of Mr. Grillo. The State candidly admits that, without acknowledging the necessity therefor, the detectives did not comply with the dictates of *Miller v. State*, 403 So.2d 1307 (Fla. 1981), now recognized as the principal "automobile inventory" case in Florida.

Although there is no absolutely sharp delineation of the matter, the court finds—as a matter of fact—that Detective Gaffney discussed with then Assistant State Attorney Jaffe the nature and contents of the material found in the vehicle about to be impounded. Surprised and annoyed by the revelations made by Detective Gaffney, Mr. Jaffe (very properly in the opinion of the court) instructed Detective Gaffney to immediately seal the materials without further examination and to hold the items until further information and advice was forthcoming. The instructions of Mr. Jaffe were, without a doubt, not obeyed by any of the detectives associated with the Broward County Sheriff's office.

Detective Gaffney remained at the scene on Southeast Sixth Court

until a tow truck removed the impounded vehicle. Detectives Barnes and Owens transported Messrs. Krasco and Caballero to Fort Lauderdale/Hollywood International Airport where there was an office for their use. En route to the airport, Detective Barnes engaged the arrested parties in a dialogue designed to elicit incriminating information, in apparent contradiction of *Edwards v. Arizona*, 451 U.S. 477 (1981), for Mr. Krasco had earlier vainly requested the opportunity to speak with Mr. Grillo and the arresting officers *knew* that Mr. Grillo represented Mr. Caballero.

The arresting officers closely examined the contents of the files removed from the now impounded vehicle, developed the unexposed film and viewed the videotape. Copies were made without the knowledge or consent of an assistant state attorney and without the prior approval of a judge. The detectives do not deny that they were aware that the materials that they examined and photocopied related to Mr. Caballero's defense. The photocopied materials were later delivered to their privately retained attorney who filed a civil case against Mr. Grillo and Mr. Krasco wherein an award of substantial monetary damages is being sought.

Although they did not deem it necessary to seek out the duty judge (whom they knew to be on 24 hour call) for judicial permission to examine materials clearly protected by the Fourth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 9, 12 and 21 of the Declaration of Rights of the Florida Constitution, the arresting detectives sought out the duty judge for the purpose of having exorbitant bonds set upon the charges for which Messrs. Krasco and Caballero had been arrrested. The setting of the high bond was, apparently, without the advice and consent of an assistant state attorney and constituted, in the opinion of this court, a blatant abuse of the trust placed in the detectives by the people of Broward County. Appropriately enough, when a full hearing was held, with counsel for the defense in attendance, the $100,00 misdemeanor bond was reduced to $500.

For reasons not clearly developed in the hours of hearing devoted to this matter by this Court, the files of Mr. Grillo and Mr. Krasco were not delivered to the Office of the State Attorney, nor were they turned in to the Sheriff's property custodians pending further judicial developments. To the surprise of the Court, the detectives left some of these very sensitive files in the trunk of Detective Barnes' automobile where they remained until he was in a very serious automobile accident, after which they were transferred to the trunk of Detective Gaffney's vehicle, there to remain until they were delivered to Assistant State

48

Attorney Marc Gordon, one of the supervisors of the organized crime unit of the State Attorney's Office. Mr. Gordon retained the files in his custody until some time in January, 1986, when he delivered them to Assistant State Attorney James Dehart who, in turn, delivered the files in his possession to the Court on January 23, 1986, at the commencement of the first day of hearing upon Defendant's Motion to Dismiss. It is to be noted that the remainder of the files seized by Detectives Gaffney, Owens and Barnes was retained by them in some undescribed section of the Sheriff's Office substation in the City of Lauderhill, and were delivered to the Court at the commencement of these proceedings on January 23, 1986. It is also important to note at this juncture that a motion for the return of the seized property was filed for record in this case on September 27, 1985, but no efforts were made by any Assistant State Attorney nor any member of the Broward County Sheriff's Office to either effect the return of the files or to obtain judicial approval of their retention pending further order of the court!

Based upon the information gleaned from the seized files and shared with him by Detective Gaffney, then Assistant State Attorney Alan Bell initiated court action designed to obtain the revocation of Mr. Caballero's bond. The request for bond revocation was denied but special conditions were imposed upon Mr. Caballero, not previously deemed necessary, to assure his appearance whenever desired by the court. Based upon the information found in the seized files, Detective Gaffney was successful in persuading his superiors to seize an airplane in Dade County, which aircraft allegedly was utilized by Mr. Caballero in the illegal narcotics business. Although the aircraft has been in the custody of the Broward County Sheriff's Office ever since its seizure (which occurred shortly after the files had been seized), no forfeiture proceedings have been instituted.

During the course of the hearing in reference to the Motion to Dismiss, Assistant State Attorney Peter Lent (upon whom the responsibility for opposing the motion finally devolved) carefully developed that all those associated with the Office of the State Attorney of the Seventeenth Judicial Circuit had assiduously avoided learning the contents of the seized files. It appears to be the belief of the State Attorney's Office that if they hear no evil, see no evil and speak no evil, then there is no evil. How sad!

## THE ARREST

The Court is in complete sympathy with the detectives insofar as they expressed emotions of anger and concern for their personal welfare as a result of the actions of Mr. Krasco in the weeks and

months preceding the arrest of August 13, 1985. However, as the Court so often instructs juries before they deliberate upon a criminal case, this case must not be decided upon feelings of sympathy for anyone nor upon feelings of anger towards anyone.

When Detective Gaffney first observed the vehicle operated by Mr. Caballero pass slowly by the Greyhound Bus Terminal, he was involved in the activity of attempting to obtain permission to search the personal luggage of a passenger whom he opined met the "drug courier profile". Detective Gaffney's attention was diverted from the passenger by what he perceived to be a dark instrument in the hands of a person whom he later discovered to be Mr. Krasco. For all that Detective Gaffney knew, the dark object he saw pointed at him through the car window could have been a firearm. The Court appreciates, and approves, the action of Detective Gaffney, Owens and Barnes in pursuing the suspect vehicle in order that they might determine just what was actually occurring. The difficulty arises not with the pursuit, but with what happened *after* the parties' identity became known to all of the detectives.

There does not exist in Florida any crime known as "Obstruction of Justice", although such a crime does exist within the ambit of the United States Code. The state crime most similar in nature to the aforesaid federal offense is a hybrid version of resisting arrest without violence by interfering with an officer in the lawful performance of a legal duty. (F.S. 843.02) A charge pursuant to F.S. 843.02 is a misdemeanor and, in the opinion of this court, would, if based upon the facts now in the record, constitute a desperate allegation designed to avoid the serious consequences that flow from an illegal arrest, search and seizure!

This Court is of the opinion that the arrest of Mr. Krasco and Mr. Caballero upon what was announced by Detective Gaffney as being for the crime of "Felony Obstruction of Justice" was a sham, designed to punish the arrested parties for conduct that occurred long before the night of their arrest.

### THE SEARCH

An automobile has long been recognized as being within the protections of the Fourth Amendment of the United States and Article I, Section 12 of the Florida Constitution, although the insulation against official intrusion into the protected area is less than that recognized for a place of residence. The cases are legion upon these points of law and the recitation thereof would be superfluous.

A recognized exception to the privacy protection of an automobile

50

exists when there is a lawful arrest of the occupants thereof; in such a case, a search of the passenger compartment and of all the containers therein found may be conducted. *New York v. Belton*, 453 U.S. 259 (1981). It is axiomatic, however, for such warrantless search to be upheld, the vehicle must first be legally within the custody of the law enforcement officers. *Michigan v. Thomas*, 458 U.S. 259 (1982)

Since the State has conceded that the detectives did not comply with the mandate of *Miller v. State*, 403 So.2d 1307 (Fla. 1981), which is still the law in Florida (State v. Small, 11 FLW 123 (Fla. 3d DCA 12/31/85)), no attempt will be made by this Court to analyze the facts in light of such case. It is sufficient to note that this Court would not uphold the instant search as being one made in the course of an investory of a vehicle pursuant to a lawful impoundment.

The Court having concluded, as indicated above, that the arrests of Mr. Krasco and Mr. Caballero were mere shams devised as a means of satisfying the emotions of Detectives Gaffney, Barnes and Owens, it necessarily follows that the search of the vehicle was not acceptable in law, either as a search incident to an arrest or as an inventory preliminary to the impoundment of the vehicle.

## CONDUCT IN REFERENCE TO TANGIBLE ITEMS SUBSEQUENT TO THE ARRESTS

As described in more detail above, none of the basic precepts for the preservation of evidence in a criminal case were observed by any of the detectives. For reasons totally without value in a criminal case, video-tapes were viewed and copied, confidential documents were photocopied, closed and locked briefcases were opened and the contents photocopied; in sum, almost everything possible short of destruction was accomplished without benefit of judicial order.

The Office of the State Attorney seeks to absolve itself of any blame in this matter by demonstrating the extremes to which the Assistant State Attorneys went in order to insure that they obtained no information from the subject files. It cannot be ignored that such information was, in fact, utilized when former Assistant State Attorney Alan Bell sought to have this Court revoke the bond of Mr. Caballero. The primary basis upon which the request for bond revocation was predicated was information found in the seized materials.

How does the office of the State Attorney explain away the fact that former Assistant State Attorney Martin Jaffe knew, immediately, that the detectives had conducted an apparently illegal search? Mr. Jaffe testified that he told Detective Gaffney to seal the contents of the files

as soon as he (Jaffe) was made aware of their nature! Why wasn't something done at the very first opportunity when court next opened for business? Why didn't Mr. Jaffe communicate the information in his possession to Mr. Bell in order that affirmative action could be promptly taken? Why did Mr. Bell permit himself to become a tool of the detectives when he asked this court to revoke the bond of Mr. Caballero? What prevented the State from, unilaterally, returning to Mr. Grillo and Mr. Krasco the entirety of the contents of all files that were seized in the August, 1985, arrest of Krasco and Caballero?

And there are more questions that need to be answered:

How do the State of Florida and the Broward County Sheriff's Office justify detectives, without benefit of court order, making copies of confidential data and then delivering such information to a private attorney for the purpose of private litigation for personal gain? If the lawful owner of such material has been unable to obtain the return thereof, how can the unauthorized disclosure thereof for private pecuniary gain be permitted to go unpunished?

And there are still more questions demanding an answer:

The evidence seized from Mr. Krasco in August, 1985, as described above, was not accorded even a modicum of protection from contamination. Detective Barnes kept some of the papers in his vehicle until his terrible accident in October, 1985, which accident almost killed him. Somehow, Detective Owens obtained possession of the contents of the trunk of Detective Barnes' car and took it to him in the hospital. Detective Barnes then kept the documents with him until he delivered them into the custody of Detective Gaffney around Thanksgiving. Detective Gaffney acted as custodian of the documents until he unloaded them on Assistant State Attorney Marc Gordon who, for the first time, took some minimal precautions to preserve the evidence.

How can such a course of action be condoned? Had the detectives accorded the alleged cocaine taken from Mr. Caballero at the time of his first arrest the same treatment that they accorded tangible items seized in August, 1985, there is little doubt in the Court's mind that the cocaine would be suppressed from evidentiary use at trial.

The Court does not quarrel with the conclusion of the State's memorandum of law that an intrusion into the attorney-client relationship does not, *ipso facto*, require the dismissal of criminal charges. Nor does the Court disagree with the State's proposition that evidence obtained in violation of the attorney-client privilege must be suppressed. Propositions of law as previously described appear repeatedly in the text of the opinions of state and federal courts throughout the

52

country. Where the Court and the State part commonality of thought is in what should be done in the peculiar circumstances of the case now under review.

As applied to a criminal case, denial of due process of law has been defined as the failure to observe that fundamental fairness which is essential to the very concept of justice. *Shuler v. Wainwright*, 341 F.Supp. 1061 (D. C. Fla. 197). The determination of whether a particular course of governmental conduct has violated the due process rights of an accused is a question of law for the trial court to resolve. *United States v. Graves*, 556 F.2d 1319 (5th Cir. 1977).

The State argues that it has obtained no insight as to the defendant's theory of the case and, therefor, the state has not been benefitted by the actions of the detectives. This argument crumbles when it is noted that the credibility of the key actors in this criminal case is what is at issue. The witnesses for the State now have at their disposal the ability to adjust their testimony in whatever fashion they deem necessary to meet the actions planned by the defense. Further, the detectives, armed with the knowledge of what the accused perceives to be their weaknesses, may now prepare in advance of trial for the microscopic examination of their unsupervised activities at the Greyhound Bus Terminal or at any other public transportation facility wherein they have been under observation. Without the intrusion into the materials seized from Mr. Krasco, the detectives would have had no idea of just what it was that the defense would explore upon the occasion of a motion to suppress or at trial.

Not to be overlooked in the emotional turmoil generated by that which is now before the Court is the testimony of former Assistant State Attorney Alan Bell that he has been questioned by Detective Gaffney concerning the propriety of an attorney advising his client to lie. Since such inquiry came only after the confidential papers were seized from Mr. Krasco, only one with intellectual blinders attached to the head could draw any conclusion other than that the inquiry was precipitated by the contents of the illegally observed files as analyzed by the detectives.

Additionally, and certainly not finally, the civil litigation instituted by the detectives has opened up an avenue of discovering information not previously available to the State. All the State has to do is monitor the civil litigation file in the Broward County Courthouse and it will have access to information it could not obtain by the discovery procedures available in the normal course of the prosecution of a criminal case.

53

There is still another consideration that weighs heavily upon the mind of the Court in its struggle to discern the intentions of the law in this matter. Several years ago the people of this state amended the state constitution so as to include Article I, Section 23, viz.:

"Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law."

If the foregoing portion of our constitution is to mean anything, the courts of this state have an obligation to enforce it against one and all, regardless of the lack of popularity of such a decision. There is no doubt in this Court's mind that there will be a great hew and cry upon the disclosure of the final decision herein, but popularity is not what the business of judging is about. Many brave jurists in the past have ruled, and many brave jurists in the future will rule, according to the law and not in accordance with the results that will meet with the greatest approval. The words quoted at the outset of this order make up the polestar by which this Court is to be guided; only history and the test of time will determine who is right.

The Court is of the opinion that Detectives Gaffney, Owens and Barnes clearly violated numerous constitutional rights of Mr. Caballero, Mr. Krasco and Mr. Grillo when the arrest and seizure of August 13, 1985, was effected. The constitutional transgressions were aided and abetted by the failure of the office of the State Attorney to take any action to minimize the impact of the actions of the detectives and, therefor, such office is not without responsibility for the prejudice visited upon the aggrieved parties.

## CONCLUSION

Any remedy fashioned by the Court in response to the actions of the detectives, and the inaction of the State Attorney's Office, must be of such a nature that there will be no reoccurrence of the conduct now reflected by the record in this case. To say that Mr. Krasco, Mr. Grillo and Mr. Caballero can find recourse of adequate proportions by the institution of civil litigation is to retreat behind a facade and avoid reality and would constitute judicial irresponsibility. If we criminal trial judges don't assert ourselves and impose harsh penalties in specific cases, we will contribute to the erosion of fundamental liberties which we all cherish. As the late Chief Justice John Marshall once wrote, we must never forget that it is a constitution about which we are expounding. *McCulloch v. Maryland*, 4 Wheaton 316, 407 (1803).

This Court does not condone in any fashion even the most insignificant antisocial act committed by Mr. Caballero that brought him before the bar of justice. As an individual, if the acts alleged by the state are true, Mr. Caballero is deserving of a substantial term of imprisonment, not only for trafficking in cocaine, but for total disrespect for the law whose protective covering he now seeks to invoke. However repugnant may be the individual on trial in a criminal case, in court there must always be fairness for it is only then that our society as a whole is protected.

For the reasons set forth above it is hereby,

ORDERED and ADJUDGED that all criminal charges now pending against Ruben Caballero in the instant case must be, and hereby are dismissed.

It is further ORDERED and ADJUDGED that the sureties upon the bond of the defendant, if any, ARE NOT to be discharged unless the State of Florida fails to take a timely appeal from the entry of this Order.